THE PEOPLE OF THE STATE OF NEW YORK ex rel. HAROLD FERRIS *v.* FRANK N. HORTON, Chief of Police of the City of Oneonta, N. Y., Respondent.

County Court, Otsego County, January 14, 1933.

*George L. Bockes*, for the relator.

*Donald H. Grant, District Attorney*, for the respondent.

VAN WOERT, J. Harold Ferris was arrested without warrant by the respondent chief of police. The causes of his arrest and detention are reviewed by a writ of habeas corpus.

Ferris is the credit manager and financial messenger of a substantial business house in the city of Oneonta; his duties require personal conduct of cash to the bank; at the time of arrest he was so engaged, and for protection of himself and the property of his employer he was carrying a pistol. Ferris displayed to the arresting officer a so-called permit or license issued to him by a justice of the Supreme Court in June, 1924, unlimited as to duration, not revoked, and conforming to the statutes then in force. He carried with him also a statement from a court of record judge, dated December 8, 1931, to the effect that he had applied for renewal or reinstatement

of such permit which had been denied. He had refused to submit to fingerprinting and photographing and the judge had refused to act in a ministerial capacity, and had taken the position that the forms required by statute, as provided, were illegal and inadequate. The respondent chief of police claims that the license of relator was nullified by legislation of September, 1931 (Laws of 1931, chap. 792), but states that action was not taken because of any anticipated danger to the public, certifies to Ferris' good character, and represents that relator was arrested in order that there be initiated a judicial inquiry as to the validity, force and effect of the so-called Sullivan Law, as amended (Penal Law, § 1897).

The district attorney, appearing at the hearing, formally objected to the sustaining of the writ, but qualified his position by stating his opinion that " the law is most unreasonable, impracticable and of doubtful legality," and " the relief for the situation confronting the public is enactment of the so-called Uniform Firearms Act as approved by the American Bar Association."

The application for the writ and return thereto present a multitude of interesting questions.

The relator claims that he is illegally detained in that:

(1) The amendment to the Sullivan Law of 1931 is unlawful in so far as it attempts to destroy a pistol permit previously lawfully granted to him by a judge of a court of record, which said permit was unlimited as to time;

(2) Section 1897 of the Penal Law, as amended in 1931, is illegal because contrary to public policy and because unreasonably inquisitorial;

(3) Also invalid as an unlawful encroachment upon private liberty and American customs;

(4) Unlawful because impracticable;

(5) Unlawful because improperly requiring judicial officers to perform non-judicial administrative functions;

(6) Unlawful because the weapon possessed by the relator was not a blackjack or a stiletto or an underworld weapon, but only a suitable pistol required for the protection of the relator and the property of his employer; and

(7) That such statute is unlawful because tending to accomplish exactly the opposite results of those contemplated in the passage of the enactment.

Practically all of the controversial questions as to the validity of the Sullivan Act are presented, including at least one that is novel, so far as this particular statute is concerned. Other questions concerning the validity and propriety of this legislation, not

directly raised in this proceeding by the relator, may be considered properly in so sweeping an attack upon the statute's validity.

The Sullivan Law, so called, now incorporated in section 1897 of the Penal Law of this State, came into existence in 1911. In its original state it was comparatively mild in its requirements, but it did for the first time place restrictions upon the possession in the home or the carrying upon the person of certain concealable lethal weapons. The law met with immediate resentment and resistance, many citizens feeling that it was an encroachment and an unreasonable restriction upon their natural right to protect themselves and their property in a manner long undisturbed.

Whether or not there is a common-law right to possess or carry firearms is a disputed question. It has been the subject of much inquiry and debate. The Constitution of the United States with its amendments affords no fitting solution. It is significant, however, in my opinion, that the original Constitution of the State of New York, enacted in 1777, antedating the Federal Constitution by some twelve years, preserved the common law of England and was singularly silent on the question of the right of the citizen to bear arms. Succeeding amendments to our State Constitution have continued that principle and have consistently avoided reference to that particular question. The Civil Rights Law of this State is of no aid as it is a mere statutory re-enactment of the provisions of the Federal Constitution, which concededly do not meet the situation.

When William and Mary came to the throne of England in 1689 they did so upon what may be termed a contract basis. The English people were aggravated by aggressions of the crown and many alleged discriminatory assaults upon the rights of citizens. These grievances were summarized in the Declaration of Rights. Among other things, complaint was made that Protestants had been deprived of means of defense while Papists were permitted to retain defensive arms. In accepting sovereignty William and Mary recognized this Declaration of Rights and acceded and consented to the enactment by Parliament of the Bill of Rights, whereby, in section 7, the right of Protestants to bear arms equally with the Papists was recognized. The phrasing is as follows: " The subjects which are Protestant may have arms for their defence suitable to their conditions, and as allowed by law."

There was here recognized a universal citizen's right to bear defensive arms, and it seems to me that the Bill of Rights established a general right on the part of all persons in England, falling within the classification of citizens, to retain arms for their protection and according to their condition, subject only to a reason-

able control by law. The phrase " as allowed by law " is an early recognition of the overlordship of the police power.

It has been argued that subsequent legislation in England materially cut down the broad rights conferred or confirmed by William and Mary. However, the statute law of England did not become our law, but common-law rights, as expressed in the Bill of Rights, were effectually incorporated into the law of the State of New York by the Constitution of 1777. (1 Lincoln Const. History of New York, p. 727.)

Accordingly, from the constitutional organization of this State until the enactment of the Sullivan Law it was generally recognized as rightful, and became the common custom, for the citizen to possess and carry weapons appropriate for the protection of himself, his family and his property. This use of weapons was not restricted in any fashion until such enactment, although doubtless subject to reasonable control under the police power.

The validity of the Sullivan Law was attacked shortly after its enactment in the frequently cited test case of *People ex rel. Darling* v. *Warden* (154 App. Div. 413). As in the present case, judicial interpretation was sought by way of a writ of habeas corpus. Mr. Justice PENDLETON sustained Mr. Darling's contentions and discharged him from custody, but upon appeal the Appellate Division reversed that action in a three to two decision, Mr. Justice SCOTT writing an often-quoted vigorous dissenting opinion. This case brought to the fore many of the questions now raised. Three justices took a view favorable to the validity of the law and three asserted themselves to the contrary, but the case was not carried to our Court of Appeals, and it is notable that throughout the controversy for over twenty years that high court has never been called upon for precise settlement of these questions.

The Court of Appeals, however, in 1912, prior to the *Darling* case, had before it the case of *People* v. *Persce* (204 N. Y. 397), wherein the right to possess a slungshot was involved. The court considered that such an instrument was peculiarly the tool of a criminal class and that the police power was properly exercised through a statute condemning and penalizing the possession thereof, but seems to have left open the question as to whether the police power may be so far extended as to condemn or penalize otherwise law-abiding citizens in possessing such instruments as by common knowledge are ordinarily and customarily used by them for their protection.

Although I am of opinion that a general right to possess arms " suitable to conditions " resides in the citizen (subject to reasonable legislative control in the public interest), such proposition

has not met with general acceptance. However, rights of citizens do not depend entirely upon written statutes or formal constitutions or bills of right. As conditions of existence change the man on the street, or the farm, law abiding and going peaceably about his business, and endowed with the inalienable permission to enjoy " life, liberty and the pursuit of happiness," may well be entitled to a means of protection unknown and unrequired in an earlier pastoral and simpler period. That householders and merchants and decent citizens generally may employ means to defend themselves from ruffian or underworld aggression in an appropriate manner should hardly be open to debate. Reasonable facilities to effectuate the same ought not to be withheld under an arbitrary exercise of the police power. Such police power, however meritorious in purpose, may not be asserted to the eclipse of right, whether statutory, or as well established by custom, or as ripened into acceptance by common knowledge.

The Legislature of this State, with a laudable intent to promote the " public safety " (this being the heading of article 172 of the Penal Law, wherein section 1897 has reposed for many years), in 1931 aggravated resentment to the Sullivan Act by imposing upon applicants for permits to carry pistols the additional requirement that they be fingerprinted and photographed. By this enactment, *supportable only as a means to promote public safety under the police power*, there is a recognition that ruffianism, evidenced by increasing violent acts effectuated by the use of concealable lethal weapons, has reached a point in this State that calls for drastic curtailment of the use of such instruments, *to the end that the same be completely withheld from the criminal class.* With such high purpose none may be heard to quarrel. That the particular legislative plan designed to carry such purpose into effect is highly idealistic and impracticable is, however, unfortunately most evident. To keep arms from the crook by any State legislation is impossible. The ruffian who has the high felonies of murder, riot, robbery or burglary at heart, and whose mere possession of a pistol is but a misdemeanor, does not hesitate to break into a hardware or sporting goods store in order to obtain the needed weapon. Moreover, he will be quite within the law, so far as procurement is concerned, by ordering and receiving a pistol or revolver from a mail-order dealer in any of those many States whose Constitutions expressly preserve a right to the citizen to use defensive arms. The Federal government does not and perhaps cannot prevent the transportation. Procurement of an arm is sadly simple, and possession of the weapon subsequently is but a misdemeanor. The potential felon is not worried thereby, nor is he

to be deterred by New York laws from acquiring an instrument to carry his nefarious plans to execution. The very proper purposes of this law are entirely negatived and rendered ineffectual by laws, customs and facilities quite above and beyond New York State's legislative control. This is but common knowledge.

Fingerprinting and photographing (colloquially " mugging "), heretofore employed chiefly as means of criminal identification and as an aid to the apprehension of malefactors, are notoriously abhorrent to the law abiding. This law of 1931 has not only failed to attain its respectable purposes but has brought about a condition that renders technically criminal a material portion of our rural citizenry. For example, in this county alone (Otsego) we note that prior to October 1, 1931, some fifteen hundred permits had been issued. Such number of citizens then possessed and presumably still possess pistols or revolvers. Since then less than three hundred have troubled themselves to even make application for reinstatement of their statutory right, as abolished by the legislation of 1931, and only two or three conscientious individuals have surrendered their weapons. Making allowance for deaths and removals, I must conclude that there are no less than a thousand qualified citizens of good character now subject to prosecution for misdemeanor in this law-abiding rural county.

Decent men resist a requirement so drastic and unnatural, even to the point of placing themselves in a criminal position, rather than submit to what they consider an unnecessarily humiliating, over-zealous and futile regulation.

This law does not keep the hand-gun from the possession of any crook; yet by its exactions and sanctions, repugnant to many citizens, heretofore duly licensed, it has rendered thousands potentially criminal. The law has failed signally and has brought about precisely the opposite of that which was intended by it. It has not disarmed the crook or rendered his possession of weapons impossible and has simply embarrassed and rendered criminal those very substantial people who are entitled to protect themselves and whose protection was sought by this legislation.

Such an exercise of police power, well recognized as ineffective in promoting " public safety," may not be supported.

The Sullivan Law is vulnerable also on the ground that it imposes ministerial duties upon judicial officers. The principle is so well settled that extensive elaboration or citation of authority is not required. It is clear that ministerial duties may not be imposed upon judicial officers. However, it is optional on their part to accept the discharge of such legislative direction, and their voluntary action thereunder is quite proper. Such is the true history

of the operation of the Sullivan Act. Many a judge, recognizing the necessities of citizens in his jurisdiction, has consented to the exercise of a ministerial function and has issued a license rather than see a proper citizen hampered in pursuit of his vocation, or embarrassed in protection of his home. Such judge has the undoubted right to so act, *but it may not be required*, and the Legislature has no right to assume that judges will acquiesce in such a requirement, and when the whole statutory scheme, wherein rights are recognized and an exclusive mechanism to provide same is set up, depends wholly upon such voluntary judicial acquiescence, which may not be assumed, the enactment is essentially vicious.

For this consideration we may well point to Surrogate FOWLER's opinion in the *Spingarn* case (*Matter of Spingarn*, 96 Misc. 141). His scholarly marshaling of authority on this particular point received commendation and approval in the Appellate Division (175 App. Div. 806) and the subsequent Court of Appeals affirmance may be considered final ratification of the principle enunciated. It is true that Judge FOWLER's decision was reversed, but it was upon the sole ground that the act there in question was actually judicial rather than ministerial.

The issuance of a pistol permit under section 1897 seems wholly ministerial. The line of demarcation appears to lie between the exercise of discretion and the following of a prescribed plan of action, the former being judicial and the latter ministerial. The only possible discretionary act under section 1897 is the determination of the " good moral character " of the applicant. Ascertaining whether the applicant may have been convicted of " crime," determinable by inspection of records, is clearly ministerial.

Determination as to character of a license applicant has been held to be ministerial in nature. The Appellate Division, Second Department, refused to review by certiorari the action of ·the New York board of education in denying a teacher's license on the ground that such action sought to be reviewed was ministerial and not judicial. The board has been called upon to pass upon " character, scholarship and fitness " (*Matter of Walker*, 68 App. Div. 196). Decision as to " scholarship " rests upon accepted arbitrary standards and is clearly a ministerial determination. The case cited, subsequently unmodified and not criticized, seems ample authority to support our conclusion that the issuance of a pistol license wherein only " good character " is involved, is but a ministerial function not lawfully imposable upon a judicial officer.

Our conclusion in this regard is strengthened by analysis of the very law itself, which confers or imposes this same power or duty upon the police commissioner of the city of New York. Such

commissioner is but a ministerial or administrative officer. In pistol permit action he must delegate his duties. Perhaps this very fact, presumably well known to the Legislature, decides our question. Judicial functions may not be delegated. The police commissioner of New York city, dealing with no less than 40,000 annual licensees (his own statement), must of very necessity delegate his authority to subordinates. Such necessary and legislatively contemplated delegation of duty characterizes the act as ministerial.

The Sullivan Law, as amended, in so far as it imposes ministerial duties upon judicial officers, is denounceable as illegal and void, in so far as it provides no alternative ministerial means for the required issuance of pistol permits to qualified citizens.

The foregoing conclusions are sufficient for our decision, no doubt, but other questions of interest are propounded. Two of them will be considered.

It is claimed that the legislation is unlawful in that the means provided for enforcement are inadequate and illegal. In this proposal there is some force. The statute enjoins upon licensing officers the use of forms provided by the State police. Such forms are clearly inadequate in many particulars. Although there must be " proof " of good character, the prepared forms provide merely for unverified references by the applicant. This falls far short of the generally-accepted standards of " proof." The application blank as provided requires the applicant to state whether he has ever been " arrested " or " indicted," irrespective of whether conviction of crime followed such arrest or indictment. Such requirements, necessarily supported by oath, outrage all of our conceptions as to proper inquiry to be placed upon a citizen. The forms provided also are deficient in that they place character upon a purely criminal record basis. A person convicted of technical crime may still retain his citizenship and be entitled to protect himself. On the other hand, many an individual, possessing the indicia of citizenship and unconvicted of any crime, is clearly untrustworthy and unfit for licensing. The forms provided fail to take account of mental unbalance or the applicant's history in that regard, and offer no suitable means of inquiry in that particular. These are but first impressions as to the inadequacy of the propounded forms. Other defects are claimed to exist. It seems unnecessary to consider them in detail.

It is also claimed that this law violates the well-understood principle that equal protection of the law is insured to all citizens. Point is made that residents of New York city, in the procurement of their rights, must apply to subordinate ministerial officers while

up-state residents receive the benefit of a court of record judge's determination. Such latter determination can be by sufferance only, as we have pointed out, and in general we cannot support the contention.

However, it is notable that permits to have a pistol in the home or to carry same upon the person may be issued only to a resident of the county and by a justice or judge of a court of record resident in such county. There are some counties in this State (and we may properly take judicial notice of the fact) where there resides but one judge of a court of record. Presumably such judge is a citizen of good moral character and entitled to protect himself and his home with pistol or revolver. Nevertheless, under the law of 1931, he has no protection and may not assert his rights unless he indulge the dubious practice of making an application to himself, then passing upon his own character and fitness, and finally issuing a license to himself.

The absurdity of this law, particularly as amended in 1931, is apparent, and for the reasons hereinbefore set forth at some length, I feel that the relator's contentions are worthy of support.

The writ of habeas corpus is sustained and the relator, Harold Ferris, is discharged from custody, and it is further directed that fingerprint and photograph records made subsequent to relator's arrest be destroyed.

I hold specifically that the permit granted to relator by a Supreme Court justice in 1924, unlimited as to time, and unrevoked, was not destroyed by the legislation of 1931, which legislation was invalid (1) as an unreasonable exercise of the police power, (2) as improperly imposing ministerial duties upon judicial officers, (3) as ambiguous and impracticable and as requiring undefined ministerial aids to discharge of judicial duty, and (4) as denying to certain individuals the equal protection of our laws.

Counsel for relator may present suitable order conforming to this decision.